UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
WILLIAM BALDWIN,

                Plaintiff,       :

                             :     **REPORT AND**
                                **RECOMMENDATION**

        -against-        :

                                07 Civ. 6958 (RJH)(MHD)

MICHAEL J. ASTRUE,         :
Commissioner of Social Security,

                             :
                Defendant.
-----------------------------------x

**TO THE HONORABLE RICHARD J. HOLWELL, U.S.D.J.:**


    Plaintiff William Baldwin commenced this action pursuant to
the Social Security Act, 42 U.S.C. § 405(g). He seeks review of a
November 2006 decision by the Commissioner of the Social Security
Administration (the "SSA"), denying his claims for disability
insurance benefits and Supplemental Security Income ("SSI") under
the Social Security Act ("the Act").


    Both parties have moved, pursuant to Rule 12(c) of the Federal
Rules of Civil Procedure, for judgment on the pleadings. Defendant
seeks to dismiss the complaint, contending that his denial of
benefits to Mr. Baldwin is supported by substantial evidence and
otherwise accords with legal requirements. Plaintiff seeks an order

reversing the Commissioner's decision denying his 2004[1]
applications for disability benefits under the Act and remanding
the case for further administrative proceedings.

For the reasons set forth below, we recommend that the case be
remanded for further consideration and administrative proceedings,
and that defendant's motion be denied.

**PROCEDURAL HISTORY**

On July 22, 2004, Baldwin filed an application for Disabled
Adult Child benefits under Title II of the Act on the account of
his retired father. (Tr. 59-68).[2] In his application, he stated
that his disabilities consisted of speech and language impairments,
an emotional disturbance, asthma, ADHD and allergies, beginning
July 8, 2004. (Tr. 60). The SSA denied his application on October
20, 2004. (Tr. 45-47). On December 20, 2004, the plaintiff filed an
application for SSI benefits under Title XVI of the Act on his own
account (Tr. 188-90), and requested a hearing on both applications.
(Tr. 48).

--------

[1] We note that the relief requested in the complaint
improperly dates the applications as being made in 2002.

[2] Baldwin had been receiving dependent benefits under Title
II on the account of his father prior to turning age 18.

2

On July 17, 2006, the plaintiff appeared with counsel[3] and participated in a hearing before Administrative Law Judge ("ALJ") David Z. Nisnewitz. (Tr. 191). On November 21, 2006, ALJ Nisnewitz issued a decision finding that plaintiff was not disabled and denying both of plaintiffs applications. (Tr. 20). Specifically, he found that despite plaintiff's non-exertional limitations compromising his ability to perform work at all exertional levels, plaintiff is capable of performing "at least unskilled work."[4] The ALJ referenced the Medical-Vocational Guidelines and concluded that a finding of "not disabled" was warranted. (Tr. 20).

Plaintiff appealed to the Appeals Council on December 28, 2006. (Tr. 9). The Appeals Council denied plaintiff's request for review of the ALJ's decision on June 1, 2007. (Tr. 4).

On August 2, 2007 plaintiff filed this lawsuit pursuant to 42 U.S.C § 405(g), seeking review of the SSA's decision. He specifically targets the ALJ's evaluation of his record and the

---

[3] Although the ALJ's opinion indicates that Baldwin appeared and testified without the assistance of an attorney (Tr. 13), in fact Baldwin's counsel attended and participated in the hearing. (See Tr. 193.)

[4] Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength." 20 C.F.R. § 404.1568(a).

failure of the ALJ to introduce evidence by a vocational expert or the equivalent to establish the existence of a substantial number of jobs that plaintiff can perform regardless of his non-exertional impairment. (Pl.'s Mem. 20-23.). Plaintiff seeks a reversal of the Commissioner's decision and a remand for further proceedings. (Id. at 24).

## FACTUAL BACKGROUND

### I.  Non-Medical Evidence

Plaintiff was born on August 20, 1986 (Tr. 188) and lives with his mother (Tr. 54, 78), Fay Christian, a reading teacher with the New York City Board of Education. (Tr. 193). Plaintiff's father is retired.  While the plaintiff was a minor he received a derivative Social Security benefit from his father's Social Security Account. (Tr. 196, 201). The plaintiff graduated from the Winston Preparatory School, a private, special education school in Manhattan in June 2006. (Tr. 195). He entered college in September 2006 to study fashion-model and logo-design photography at the School of Visual Arts. (Tr. 194-95). Plaintiff has no past relevant work. (Tr. 60).

4

Plaintiff submitted several disability reports during the course of his application for SSI benefits that include information about his claimed conditions. (See Tr. 59, 69, 78, 92). In a report dated July 8, 2004 (Tr. 59-68), he claimed disability beginning as of the date of the report. (Tr. 60). He reported suffering from speech and language impairments, an emotional disturbance, asthma, attention deficit hyperactivity disorder (ADHD) and allergies. (Tr. 60). However, he reported that he does not suffer from pain (Tr. 60) and that he does not take any medication. (Tr. 65). He also stated that he attends special education classes and that he has not completed any type of special job training, trade or vocational school. (Tr. 66). Finally, he can read and understand English (Tr. 59).

In a report dated August 16, 2004 (Tr. 78-86), he stated[5] that he has a speech disorder and expressive and receptive language delays. (Tr. 83). He is dyslexic and has ADHD. (Tr. 84). He also has difficulty in following instructions[6] and directions (Tr. 84),

_____

[5] This report was completed by his mother, Fay Christian. (Tr. 78).

[6] He reported that he cannot follow written instructions, and sometimes (but not constantly) can follow spoken instructions. (Tr. 84). He also has difficulty in following many or multiple directions. (Tr. 85).

he cannot sit still and has compulsive behavior. (Tr. 83). He has behavioral problems and difficulty with authority. (Tr. 84). He does not respond well to change and he wants the same schedule, places, clothes and activities. (Tr. 85). He is not able to socialize well with his peers because he is self-conscious and embarrassed about his poor academic abilities and speech articulation. (Tr. 82). He is unable to express himself verbally and becomes frustrated when others do not understand him. (Tr. 83). He does not function well in social situations, and he often displays inappropriate language and behavior. (Tr. 85). He can be aggressive to his mother and also exhibits aggression when threatened or fearful of others. (Tr. 83). He is not independent or responsible for meeting his daily needs and he cannot perform daily tasks without supervision. (Tr. 85). He is unable to handle financial matters, including paying bills, handling a savings account or using a checkbook or money orders. (Tr. 82). He is awakened by his mother, has problems with personal care and must be reminded to take his medication. (Tr. 79, 80).

In a report dated December 19, 2004 (Tr. 92-98), he stated that he takes Prevacid (30 mg) for ulcers and Albuterol for asthma. (Tr. 95). He also reaffirmed that he has not completed any type of job training or trade or vocational school since he last completed

6

a disability report. (Tr. 96).

In plaintiff's July 8 and December 19 reports he also stated that since January 2002 he has visited Gildo Consolini, a psychotherapist, for treatment of his emotional problems. (Tr. 62, 93).[7] He also reported visiting Susin Gladstone, a language and speech therapist, since December 2001 for his speech problems, receiving directions and comprehension exercises as treatment. (Id.).[8]

Finally, on May 13, 2004, the New York City Board of Education completed an Individualized Education Program ("IEP") for him.[9] (Tr. 159-71). The IEP noted that plaintiff had been diagnosed with attention deficit hyperactivity disorder and with a speech or language impairment. (Tr. 159).

---

[7] Mr. Consolini's report indicates that he started treating Baldwin in January 2003 (Tr. 115). There is no indication of any attempt to resolve this discrepancy in the record.

[8] Ms. Gladston's report indicates that she began treating Baldwin in September 2002. Again, there is no mention of this discrepancy in the record.

[9] Although the ALJ included the IEP in the list of "medical records," it does not qualify as medical evidence. See 20 C.F.R. § 913(d) (reports from educational personnel are an "other source[]" of information about an impairment, not a "medical source").

Regarding plaintiff's academic performance and learning characteristics, the IEP reported that plaintiff was administered the Wechsler abbreviated scale of intelligence on January 9, 2002 and obtained an IQ score that fell within the low-average range. (Tr. 161). Overall, plaintiff was expected to perform at a level that was somewhat lower than the performance of same-aged peers. (Tr. 161). Therefore, the IEP indicated that plaintiff's academic management needs could best be met in a small, structured class setting within a New York State approved non-public school program with the related services of counseling and speech/language therapy. (Tr. 161, 167, 168). According to the IEP, a 12-month school year was warranted. (Tr. 161).

As for plaintiff's social and emotional performance, the IEP reported that his behavior did not seriously interfere with instruction and could be addressed by a special education classroom teacher. (Tr. 162). It also suggested that plaintiff would benefit from strategies to help him stay aware of his feelings and control his frustration before it becomes problematic. (Id.). Regarding plaintiff's health and physical development, the IEP reported that he continued to require assistive technology due to graphomotor[10]

---

[10] "Graphomotor" is defined as "pertaining to, or affecting, the movements required in writing". Dorland's Illustrated Med.

difficulties. (Tr. 163).


The report then detailed Baldwin's annual goals and short-term objectives, which included identifying triggers that cause him to withdraw or act out and coming closer to meeting grade-level performance standards in reading, writing and math. (Tr. 164-66). It was noted that plaintiff could participate in all school activities, such as lunch, assemblies and trips. (Tr. 169). He should participate in a hands-on academic vocational program and he would benefit from participation in a community arts program. (Tr. 170). Finally, he should meet with appropriate school counselors to formulate a career plan (Tr. 170), and he should investigate services provided by the New York State Vocational and Educational Services for Individuals Program. (Tr. 171).


II. <u>Medical Evidence</u>


   A. <u>Treating Sources</u>


      1. <u>Learning Specialist/Speech and Language Therapist</u>


Susin Gladstone, M.A., a Learning Specialist and Speech and

---

<u>Dictionary</u> 717 (28th ed. 1994).

Language Therapist,[11] reported that she began providing one-to-one learning therapy to plaintiff in September 2002, first twice-weekly for 45-minute sessions and since September 2003 once a week for 90-minute sessions. (Tr. 122). The record before the ALJ contained one speech/language questionnaire and two Progress Reports from Ms. Gladstone.

In her Progress Report dated May 5, 2005 (Tr. 172-73), Ms. Gladstone noted that the plaintiff had been diagnosed with a multiplicity of learning difficulties, which have resulted in significant delays in cognitive, perceptual, speech, language and social emotional areas. (Tr. 172). She also reported that although the plaintiff had demonstrated observable progress during the year preceding the report,[12] he continued to display severe delays in all

_____

[11] During Baldwin's hearing, the ALJ questioned whether Ms. Gladstone was licensed as a speech therapist by the State of New York. The plaintiff's mother said Ms. Gladstone told her that she was a licensed speech therapist, although both the plaintiff's attorney and the ALJ questioned why Ms. Gladstone's letterhead did not include this qualification. (Tr. 212-13; see Tr. 172). The ALJ then suggested that he was willing to assume that Ms. Gladstone was a state-licensed speech therapist. (Tr. 213). However, there is no indication in the record that the ALJ conducted further inquiry into Ms. Gladstone's qualifications. In his decision he referred to Ms. Gladstone merely as "a learning specialist/speech and language therapist." (Tr. 18).

[12] For example, the plaintiff took an interest in team sports, monitored his diet and lost a noticeable amount of weight, and developed some casual friendships. (Tr. 172).

areas of development. (Tr. 173). She opined that the growth that Baldwin was demonstrating resulted "from the efforts of highly specialized teachers, a great deal of one-on-one instruction, behavior modification, consistent speech and language therapy and other supports". (Id.). As she pointed out, though, even with the daily assistance of his organizational specialist, plaintiff continued to lose assignments. (Id.).

According to the report, plaintiff learned best through his visual modality. (Id.). His auditory memory and processing skills were profoundly delayed, as was his discrimination. (Id.). His auditory acuity was reported to be within normal limits, but his auditory attention was poor. (Id.). Also, his receptive and expressive vocabulary skills were typical of a much younger student. (Id.). When asked simple "Wh questions,"[13] plaintiff was not always able to provide appropriate answers, even to those questions that pertained to his personal fund of information. (Tr. 173). Plaintiff was also challenged by single-step instructions, and his expressive language skills remained weak, although when working one-on-one, plaintiff was always able to produce the correct sounds when reminded. (Id.) Baldwin's written language

---

[13] Questions asking "who, what, where, when, why." (Tr. 123).

skills were very poor. (Id.).

The learning specialist summarized her diagnosis by noting that overall the plaintiff presented as a student with significant difficulties in all areas. (Id.). In her opinion, it was essential that he continue his education in a highly-specialized setting, at all times structured, with individualized attention available throughout the day. (Id.). In addition, she stated that plaintiff needed the related services that were in place for him at that time, and she strongly suggested that realistic vocational goals should be set for him. (Id.)

Ms. Gladstone also completed a speech/language questionnaire, dated August 16, 2004, in which she opined that approximately 95% of plaintiff's speech was intelligible to unfamiliar listeners. (Tr. 120). Plaintiff was mostly able to comprehend 1-step directions, and could comprehend some 2-step directions, but could not comprehend any 3-step directions. (Id.). According to her diagnosis, plaintiff had "significant receptive and expressive language disabilities, in his case, not related to his speech production, but rather the content of his utterances." (Id.). Finally, she suggested that plaintiff needed to have frequent reinforcement even in a one-to-one setting. (Tr. 121).

12

In her August 16 questionnaire, Ms. Gladstone frequently referred to another Progress Report, dated May 12, 2004. In that report, Ms. Gladstone concluded that although plaintiff had matured in many ways, he remained an individual with significant challenges. (Tr. 122). His expressive and receptive language skills were markedly below age-level, related to deficits in auditory memory and processing. (Id.). In her opinion, plaintiff's most profound deficits were language-related. (Tr. 123). Baldwin was also found to have difficulty understanding spoken and written directions, and although his speech was intelligible, he had to be reminded to lift his head, raise his voice and open his mouth when speaking. (Id.). His written language skills also appeared to be extremely limited. (Id.). Not only did he struggle with reading comprehension, but serious deficits in his comprehension remained when he listened to material read aloud to him, even when tasks were highly concrete. (Id.). In addition, his functioning and his abstract verbal reasoning skills were reported to be characteristic of a much younger student.   (Tr. 122-23). Thus, Ms. Gladstone reported:

> At the age of 17.8 years, William cannot list even five of the United States. He becomes confused and names cities and towns. He does not know the states that border New York. His fund of personal information is limited. He has difficulty with all serial language tasks, including listing the months of the year, quickly and in order. He cannot determine, for example, which number comes before

> 53 without taking time to work through the question. When
> presented with simple WH questions (who, what, where,
> when, why) William frequently offers tangential or
> unrelated responses.

(Tr. 122-23). On the other hand, the learning specialist also referred to the fact that plaintiff was a talented artist and a visual learner with an intense interest in films and comic books. (Tr. 122).

Ms. Gladstone also stated that plaintiff was self-conscious about his limitations and that he would often appear to be indifferent about his work. (Tr. 123). More likely, she opined, he was embarrassed and fearful of failure, but generally would work cooperatively when motivated. (Id.). The learning specialist stressed how essential it was for him to be in a highly structured learning environment, where he could receive individualized attention in small groups of other teenagers with similar dysfunctions. (Id.). She recommended that plaintiff be placed in a highly structured, self-contained learning environment and that he undergo vocational counseling, which she deemed to be essential for providing realistic goals. (Tr. 123-24).

## 2. Psychotherapist

Plaintiff also received treatment from a psychotherapist, Gildo Consolini, MSW, CWS, who reported treating plaintiff on a weekly basis from January through October 2003 and on a twice-weekly basis from November 2003 to August 2004. (Tr. 115). In addition to his individual sessions with the plaintiff, he also saw the plaintiff's mother approximately once a month for counseling sessions. (Id.).

In a report dated May 5, 2003, Mr. Consolini pointed out that deficits in plaintiff's ability to use language hampered him considerably, noting that his angry, disruptive outbursts have had much to do with his difficulties in verbalization. (Tr. 117). He opined that individual treatment was preferable to group treatment at that point. (Tr. 118). He also determined that Baldwin required individualized attention for his issues of separation and individuation. (Id.).

In a report dated August 10, 2004 Mr. Consolini reported that although plaintiff had made steady progress in his academic and personal adjustment, he remained unable to support himself, complete high school or gain employment due to his psychological

15

problems. (Tr. 115). The psychotherapist also stated that despite the fact that plaintiff's ability to adjust to academic and social settings and situations had improved, he still required intensive psychotherapeutic treatment because of his difficult-to-control anger, his limited frustration tolerance and his concentration problems. (Id.). Finally, Mr. Consolini stated his expectation that plaintiff would manage to complete his high school education, if placed within a smaller academic environment geared toward providing him with an individualized learning experience and with additional psychotherapeutic support. (Tr. 115-16). In his view, Baldwin would even be able to become gainfully employed upon completion of his education and would eventually be able to support himself. (Tr. 116).[14]

---

[14] Mr. Consolini also completed a Statement of Patient's Capability to manage benefits on July 8, 2004, in which he generally reported the same observations. (Tr. 113-14). Among other things, he stressed that plaintiff was dependent on his mother and was unable to provide for himself or manage his finances and other personal matters. (Tr. 114).

B. Examining Sources


1. Lindamood-Bell Test Results


Baldwin completed several tests on June 29, 2006 which revealed continued delays in all areas of academic function. The results reflected a mental age of 9 years old on the test of "Verbal Absurdities", a score in the first percentile and reflecting an age equivalent of 11.4 on the "Test of Problem Solving-Adolescent", a fifth-grade reading level on the Woodcock Mastery Test, a 4.9 grade-level score on the Slosson Oral Reading Test, a fourth-grade score on spelling, and a sixth-grade score on arithmetic. (Tr. 174-75). Additionally, plaintiff could read at 100% only on a third-grade level. (Tr. 175). On tests of oral reading, plaintiff scored in the second percentile on reading rate, accuracy and comprehension. (Id.). He scored below the first percentile in fluency. (Id.).


2. Program Director, Center for Attention & Learning Disorders


Michele Shackelford, Ph.D, the program director at the Center for Attention and Learning Disorders, examined plaintiff on January

17

12 and January 17, 2006. The resulting Neuropsychological
Evaluation concluded that plaintiff presented with a language-based
learning disability and was found to meet the criteria for a Mixed
Receptive-Expressive Language Disorder, a Reading Disorder and a
Disorder of Written Expression. (Tr. 183). Dr. Shackelford noted
that Baldwin was a young man of at least average intelligence, who
presented with cognitive weaknesses in language skills and working
memory. (Id.) Plaintiff's nonverbal cognitive skills were good (Tr.
180), but academically he continued to struggle with reading and
writing (Tr. 182), due to his language-based learning disability.
(Tr. 183).

In terms of plaintiff's test results, he scored a Full Scale
IQ of 89 (23rd percentile) on the Wechsler Adult Intelligence Scale-
Third Edition. According to Dr. Shackelford, this result was not a
valid indication of his general intellectual abilities, which were
in the average to high-average range. (Tr. 179). On the other hand,
Dr. Shackelford considered plaintiff's Verbal IQ of 83 (13th
percentile) to be reflective of the language difficulties that he
had experienced since kindergarten. (Id.). Dr. Shackelford found
plaintiff's memory for visual information to be overall stronger
than his memory for verbally presented material. (Tr. 181).
However, his verbal memory abilities improved when the material was

presented in a meaningful context. (<u>Id.</u>).

Plaintiff's performance on a task of reading comprehension (Nelson-Denny) was found to be in the very low range. (Tr. 182). Dr. Shackelford also reported that plaintiff had a very hard time comprehending what he was reading, even when given extra time. (<u>Id.</u>). In addition, plaintiff had great difficulty completing a longer writing activity, as he made many spelling and grammatical errors that made his writing unclear and difficult to understand. (<u>Id.</u>). It was also difficult for him to expand on his ideas and express himself adequately. (<u>Id.</u>). Plaintiff's math calculation skills were in the average range and therefore were reported as an academic area of strength. (<u>Id.</u>). However, his performance in math suffered when he was asked to work quickly. (Tr. 183).

Regarding plaintiff's personality and social-emotional functioning, he tried hard to integrate information and make sense of the world around him, although he was frequently unsuccessful. (<u>Id.</u>). Dr. Shackelford indicated that plaintiff's language problems made it difficult for him to communicate verbally and impeded his ability to relate appropriately to others. (<u>Id.</u>). On the other hand, the evaluation noted that his reality testing was intact, and that this was a great strength for plaintiff. (<u>Id.</u>). Finally, Dr.

Shackelford stressed that plaintiff would require specific accommodations in his academic classes to enable him to learn the material and to demonstrate his knowledge. (Tr. 183-84). In her opinion, Baldwin had the ability to be successful in the field of visual arts, as long as he was not penalized too heavily for his learning disabilities. (Tr. 184).

### 3. Speech and Language Pathologist

Dr. Mindy Singer, a New York State licensed speech and language pathologist, conducted a consultive examination of Baldwin upon referral from the New York State Office of Temporary and Disability Assistance. In her Speech and Language Evaluation Report dated September 28, 2004, Dr. Singer noted that Baldwin demonstrated excellent attention span and was cooperative and focused throughout the testing. (Tr. 128). Plaintiff presented adequate skills in the use of language to communicate and interact with those around him, such as asking for help and responding to requests. (Tr. 129). The report also mentioned that plaintiff established eye contact but did not readily maintain it. (Id.). Plaintiff made no errors on the Goldman-Fristoe 2 Test of Articulation, which was administered to assess articulation skills at the word level. (Id.). Plaintiff's intelligibility was also

20

judged to be good. (Id.).

Ultimately, Dr. Singer diagnosed Baldwin with a moderate receptive and severe expressive language delay and recommended speech and language services. (Tr. 130). She based her conclusion on test results showing that the plaintiff scored in a single-digit or decimal percentile in all but one category of the Clinical Evaluation of Language Fundamentals (CELF-4) exam. (Tr. 128-29). Dr. Singer pointed out that the results obtained at that time appeared to be significant and as such were consistent with the plaintiff's allegations. (Tr. 130).

### 4. Psychiatrist

Dr. Joshua Algaze, a psychiatrist, examined the plaintiff at the request of the SSA on August 24, 2004. In his psychiatric evaluation, Dr. Algaze diagnosed the plaintiff with an adjustment reaction to illness with depression and anxiety, a speech developmental disorder, and a personality disorder, and he recommended ruling out borderline mental retardation. (Tr. 126). In addition, Dr. Algaze strongly recommended that the plaintiff undergo psychiatric treatment, vocational rehabilitation and psychological testing. (Id.). Furthermore, he opined that plaintiff

would not be able to manage his own funds. (<u>Id.</u>).

Based on plaintiff's mental status examination, Dr. Algaze found him to be somewhat shy, though he exhibited normal psychomotor activity. (Tr. 125). He also appeared occasionally hesitant and unsure of his responses. (<u>Id.</u>). His speech was found halting, not spontaneous. (<u>Id.</u>). The report also mentioned that the plaintiff exhibited mild-to-moderate receptive and expressive language skill deficits. (<u>Id.</u>). His thinking was concrete but logical, although his thought content centered mainly around his feeling of embarrassment and shame over his cognitive and speech deficits. (<u>Id.</u>). His intelligence level was reported as low-average. (Tr. 126). In terms of plaintiff's attention and concentration, when he was asked to do serial of three he repeated the question once or twice before he was able to understand the task. (<u>Id.</u>). In a test of plaintiff's memory, he was able to recall three-out-of-three objects after five minutes. (<u>Id.</u>). Furthermore, his fund of knowledge was reported as average, his mood occasionally angry and depressed and his insight and judgment fair. (<u>Id.</u>). Finally, plaintiff did not appear able to engage in age-appropriate social activities. (<u>Id.</u>).

5. School Psychologists

a. Felicia Polikoff

Felicia Polikoff, M.S., a school psychologist, conducted a psycho-educational evaluation of Baldwin on April 7, 2004 to determine the most appropriate academic and social/emotional interventions for him. Ms. Polikoff reported that the plaintiff was polite, cooperative and respectful throughout the evaluation process. (Tr. 110). He spoke in a generally clear fashion and was easily understood by the examiner. (Id.). On the Wechsler Individual Achievement Test-II, plaintiff performed equally well on tasks that required him to correctly read a series of printed words, and on tasks that required him to read sentences and paragraphs and answer questions about what he had read. (Tr. 112). In overall reading skills, plaintiff performed well below the average range. (Id.). On the other hand, in the area of mathematics the plaintiff performed in the average range, and his skills exceeded those of approximately 19 percent of individuals his age. (Id.). Finally, on tasks that required him to compose an organized, persuasive essay on a named topic, plaintiff was reported to perform well below the average range. (Id.).

Ms. Polikoff opined that overall, based on the results, plaintiff could be expected to perform at a level somewhat lower than his same-aged peers. (Id.). She also noted that although the plaintiff seemed to have a better view of himself and others as compared to previous assessments, he might not always be able to respond in appropriate ways, especially when faced with academic demands that he could not meet. (Id.). Finally, she suggested that Baldwin would benefit from strategies that would help him stay aware of his feelings and control his frustration before it became problematic. (Id.).

### b. Dr. Dewey Aleem

Dr. Dewey Aleem, Ph.D., NCSP, a school psychologist, evaluated the plaintiff on February 12, 2003. He had previously examined the plaintiff on January 9, 2002. Dr. Aleem stated in his psychological report that Baldwin was cooperative and responsive, established intermittent eye contact and tried to meet the demands of the test situation. (Tr. 106). In addition, the plaintiff provided accurate biographical information. (Id.).

According to Dr. Aleem, the plaintiff "continued to impress as an insecure, uneasy adolescent with faulty ego processes and

24

related difficulty with coping with heightened levels of anxiety and frustration, and his feelings of being overwhelmed and ineffective attempts to manage such feelings." (Tr. 108). He was also reported to have difficulties with "concentration and attention, low self-esteem and low self-confidence, anxiety in unfamiliar situations and atypical worries and fears. There was also a tendency to act out." (Id.). Finally, Dr. Aleem opined that the plaintiff "would benefit from a structured, supervised, therapeutic educational environment with remediation and counseling services. He would also benefit from a speech and language evaluation and/or progress report." (Id.).


C. Consulting Sources


1. State Medical Consultant


    Dr. E. Charles, M.D., a state agency medical consultant, examined plaintiff's claim file and completed a mental Residual Functional Capacity ("RFC") Assessment[15] dated October 12, 2004. The

---

    [15] A claimant's RFC refers to his maximum remaining ability, despite his limitations, to do sustained work activities in an ordinary work setting on a regular and continuing basis. The RFC assessment must include a discussion of the individual's abilities on that basis. Schultz v. Astrue, 2008 WL 728925, at *6 (N.D.N.Y. Mar. 18, 2008) (quoting Melville v. Apfel, 198 F.3d 45,

assessment form instructed that each of Baldwin's mental activities
was to be evaluated within the context of his capacity to sustain
that activity over a normal workday and workweek on an ongoing
basis. (Tr. 131). Dr. Charles could assign one of five categories
to each skill, depending on the degree of the plaintiff's
limitation: 1) Not significantly limited, 2) Moderately limited, 3)
Markedly limited, 4) No evidence of limitation and 5) Not ratable
on available evidence. Dr. Charles indicated that the plaintiff was
"moderately limited" in twelve areas: 1) "the ability to understand
and remember detailed instructions", 2) "the ability to carry out
detailed instructions", 3) "the ability to maintain attention and
concentration for extended periods", 4) "the ability to sustain an
ordinary routine without special supervision", 5) "the ability to
work in coordination with or proximity to others without being
distracted by them", 6) "the ability to complete a normal workday
and workweek without interruptions from psychologically based
symptoms and to perform at a consistent pace without an
unreasonable number and length of rest periods", 7) "the ability to

---

52 (2d Cir. 1999)). If a claimant has more than one impairment,
all medically determinable impairments must be considered,
including those that are not "severe." The assessment must be
based on all relevant medical and non-medical evidence, such as
physical abilities, mental abilities, and symptomology, including
pain and other limitations that could interfere with work
activities on a regular and continuing basis. 20 C.F.R. §§
404.1545(a)(1)-(3), 416.945(a)(1)-(3).

interact appropriately with the general public, 8) the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes", 9) "the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness", 10) "the ability to respond appropriately to changes in the work setting", 11) "the ability to travel in unfamiliar places or use public transportation", and 12) "the ability to set realistic goals or make plans independently of others". (Tr. 131-32). However, despite the fact that plaintiff was found moderately limited in all of these areas, Dr. Charles concluded that plaintiff's limitations were not significantly impeding his mental abilities for substantial gainful activity. (Tr. 133).

Dr. Charles also reviewed the evidence in the record and completed a psychiatric review technique form dated October 14, 2004. He found that the plaintiff met the diagnostic criteria for affective disorders and personality disorders. (Tr. 136). Specifically, he noted that the plaintiff had an adjustment disorder with depression and anxiety (Tr. 139), a personality disorder, moderately severe speech and language delays (Tr. 143), and moderate difficulties in maintaining social functioning (Tr. 146). In addition, the review reported one or two episodes of

deterioration, each of extended duration. (Id.). Notwithstanding these findings, Dr. Charles reported that the evidence did not establish the presence of "C" criteria, which among other factors would reflect a chronic affective disorder "of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity." (Tr. 147).

### 2. Speech and Language Medical Consultant

On October 8, 2004 the state disability analyst tasked with reviewing Baldwin's claim for benefits sent an electronic request for medical advice to a speech and language medical consultant, identified in the record only as "Liddie". (Tr. 150). The consultant was asked to determine whether Baldwin's speech and language impairment met or equaled the Listings[16], and if not, to forward the case to a psychological medical consultant for

---

[16] "The Listings" refer to a list of impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. "The third inquiry [in the disability analysis] is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). If claimant does not have a listed impairment, the Commissioner will move to the fourth step of the mandated five-step analysis to determine disability. Id.

evaluation. (Id.).

The consultant provided an evaluation on October 13, 2004. (Id.). After reviewing the plaintiff's September 2004 speech and language scores on the CELF-4, the consultant reported that the plaintiff had moderate deficits in comprehension and severely impaired expressive language skills. (Id.). The consultant also referred to informal reports indicating that Baldwin had poor vocabulary and grammar skills and also deficits in his ability to process auditory information. (Id.). However, the consultant noted that the plaintiff was reported to communicate functionally in social contexts despite the deficits. (Id.). The consultant also found that plaintiff was able to express himself using complete sentences, provide biographical information, describe his experiences, request information and clarifications, engage in conversation and tell jokes. (Id.). He was also reported to have adequate pragmatic language skills. (Id.). In addition, his articulation skills were within normal limits and his speech was 95% intelligible. (Id.). Based on these findings, the non-examining consultant concluded that plaintiff's communication impairment did not meet/equal listing 2.09.[17] (Id.).

---

[17] Listing 2.09 refers to "[l]oss of speech due to any cause, with inability to produce by any means speech that can be heard,

### 3. State Disability Analyst

On October 14, 2004, Mr. Weinstein, the state disability analyst[18] reviewing plaintiff's claim, analyzed the medical evidence on file and completed a physical Residual Functional Capacity (RFC) Assessment.[19] He diagnosed the plaintiff as suffering from asthma and allergies. (Tr. 151, 155). He reported, however, that plaintiff had no exertional (Tr. 152), postural (Tr. 153), manipulative (Tr. 154), visual (Tr. 154) or communicative limitations (Tr. 155).

Also on October 14, Mr. Weinstein completed a report of contact form that analyzed Baldwin's claim for benefits, including a discussion of his physical and psychiatric RFCs. He found that the plaintiff's physical RFC showed that he had no exertional

---

understood or sustained". 20 CFR Pt. 404, Subpt. P, App. 1.

[18] The ALJ's decision referred to Mr. Weinstein as a "State agency vocational specialist," (Tr. 17) although there is no indication in the record that Mr. Weinstein possessed vocational expertise. Mr. Weinstein listed his title as "Disability Analyst II." (Tr. 135).

[19] The first page of the physical RFC improperly indicates that it was completed on October 17, 2004. (Tr. 151). However, since Mr. Weinstein's October 14 report of contact form references the completed physical RFC (Tr. 135), the better reading of the somewhat ambiguous handwritten date on the physical RFC is October 14. (Tr. 158). The October 14 report of contact is unlikely to have referenced a document that was not completed until October 17.

limitations. (Tr. 135). Baldwin's psychiatric RFC was limited to understanding, remembering and carrying out simple instructions. (<u>Id.</u>) Plaintiff's concentration was classified as adequate. (<u>Id.</u>). The disability analyst concluded that since the plaintiff had no past relevant work, he could perform the following jobs, which he characterized as simple and low-stress: "Odd piece checker (Knitting), Bunch trimmer, mold (Tobacco), Wood inspector (Paper and Pulp)." (<u>Id.</u>). Therefore, Mr. Weinstein reported that plaintiff's claim for benefits had been denied. (<u>Id.</u>).


III. <u>The Hearing Before the ALJ</u>


    A. <u>Plaintiff's Testimony</u>


Plaintiff testified that he has a high school diploma from Winston Preparatory High School. (Tr. 195). He reported that he was in special education at school because he has a language and speech disability (<u>Id.</u>). He also testified that he studies fashion-model and logo-design photography as a freshman in the School of Visual Arts. (Tr. 194, 195). He has a camera and knows how to use a digital one. (Tr. 199). He also has a computer and knows how to print out photos on it. (<u>Id.</u>). He can also follow steps to download and manipulate photos from his digital camera using his computer.

(Tr. 223, 224). He knows how to read and write. (Tr. 196). He is an avid collector of comic books and likes reading them. (Id.). He can also follow instructions on cookbooks because they are simple and go straight to the point. (Tr. 224, 225). However, he is not good at reading novels and "complicated stuff". (Tr. 224). He testified that he could not understand some words and that sometimes he got a headache trying to understand the real meaning of some words. (Tr. 222). He likes playing golf and softball. (Tr. 197). Finally, he testified that he could count his money and that he could tell when people were gypping him. (Tr. 223).


B. Testimony by Plaintiff's Mother


Baldwin's mother testified at the hearing that her son suffers from speech and language delay. (Tr. 198). In her opinion the receptive delay was more severe, as he has more difficulty understanding what he is told than in expressing himself. (Id.). She also pointed out that plaintiff's chronological age does not match his mental age. (Id.). In addition, according to his mother, Baldwin was very easily frustrated (Tr. 229), has great difficulty focusing (Tr. 222) and cannot manage aspects of daily living, such as managing money and taking care of bills. (Tr. 219). When asked by the ALJ if she thought that the plaintiff could perform simple,

32

repetitive jobs, she agreed that her son could sit in a room Xeroxing. (Tr. 221). However, she testified that her goal was to find something where plaintiff would learn skills and would be able to take care of himself, as her money was being used to try to improve her son's condition. (Tr. 221-22). Finally, she stated that her son needed counseling, but she could not provide it. (Tr. 228).

## C. Testimony by Non-Examining Consultant

At the hearing, the ALJ called a medical consultant to testify about his impression of plaintiff's status. Dr. Allan Rothenberg, a pediatrics specialist, testified based on his review of the record and observation of the testimony at the hearing. (Tr. 201, 209). Dr. Rothenberg has no formal training in speech and language pathology, although he treats children with speech and language problems and is a consultant to an early-intervention program. (Tr. 209).

When asked by the ALJ whether Baldwin met or equaled a listing in the SSA regulations, Dr. Rothenberg testified that, prior to age 18, he would have met a listing.[20] (Tr. 202). However, in his

---

[20] Specifically, he would have met listing 112.11, which defines standards for Attention Deficit Hyperactivity Disorder.

opinion Baldwin's condition did not meet or equal the requirements of any listing that applies to persons over age 18. (Tr. 203).

To substantiate his opinion, Dr. Rothenberg cited a number of documents in the record. He first referred to the October 14, 2004 Psychiatric Review Technique Form completed by Dr. E. Charles. (Id.). He noted that Dr. Charles had characterized the plaintiff's functioning as "mildly limiting, moderately limiting, but not markedly or extremely limiting". (Tr. 203). From that, Dr. Rothenberg drew the conclusion that the psychiatrist thinks that plaintiff can work. (Id.). He also noted that on page 15 of Dr. Charles' form, he cited the opinion of a speech and language therapist that the plaintiff had adequate pragmatic skills. (Id.).[21] Dr. Rothenberg noted that the plaintiff's participation at the hearing also indicated that he was able to converse. (Id.).

He then referred to the report of Mr. Weinstein, whom he

_____

Dr. Rothenberg concluded that Baldwin exhibited all three of the symptoms listed in 112.11(A) as well as 112.02(B)(2)(a) (marked impairment in age-appropriate cognitive functioning) and 112.02(B)(2)(d) (marked difficulties with concentration, persistence and pace), thus satisfying the requirement of 112.11(B). (Tr. 202).

[21] The fifteenth page of Dr. Charles' report is actually the report of the speech and language medical consultant referred to in the record only as "Liddie." (Tr. 150).

identified as a vocational expert, despite the fact that his title is "Disability Analyst II" and the record does not contain evidence of any vocational expertise.[22] Dr. Rothenberg stated that in Mr. Weinstein's opinion the plaintiff could "hold a job." (Id.).

Dr. Rothenberg also cited the October 12, 2004 Mental Residual Functional Capacity Assessment completed by Dr. Charles. He pointed out that Dr. Charles' responses indicated that plaintiff suffers from mild to moderate or moderate limitations. (Id.).

As for Dr. Algaze's August 24, 2004 psychiatric evaluation of the plaintiff,[23] Dr. Rothenberg repeated the diagnosis that plaintiff suffers from adjustment reaction to illness with depression and anxiety, and a mental and personality disorder. Dr. Rothenberg expressed surprise that Dr. Algaze recommended ruling out borderline mental retardation, since, according to Dr. Rothenberg, no one who talked with the plaintiff for a few minutes could think that he was borderline mentally retarded. (Tr. 205-06).

---

[22] Mr. Weinstein's role is discussed supra pp. 30-31.

[23] Dr. Rothenberg referred to this report as being part of Exhibit 13F, but in the record the Commissioner provided to the court it appears as Exhibit 6F. (Tr. 125-26).

Dr. Rothenberg then addressed Susin Gladstone's May 5, 2005 progress report, stating -- inaccurately -- that it reported that plaintiff had demonstrated "excellent improvement"[24] in the past year due to the "efforts of highly-specialized teachers, a great deal of one-on-one instruction and behavior modification". (Tr. 206). He also referred to Ms. Gladstone's conclusion that plaintiff's auditory memory and processing skills were profoundly delayed. (Id.).

Dr. Rothenberg also cited Michele Shackelford's January 2006 neuropsychological evaluation. (Id.). He testified that it was interesting that on a test that evaluated verbal and language-based skills and abilities, plaintiff scored in the 37th percentile in the subcategory of comprehension, which Dr. Rothenberg classified as "not so bad." (Id.). He also cited Dr. Shackelford's findings that Baldwin had low-average to average scores on various measures of reading ability, not significantly below-average scores. (Id.)

---

[24] In fact, Ms. Gladstone's report did not characterize Baldwin's improvement as excellent. She described his advances in the past year as the "most observable progress" he had made compared to prior years, and then qualified the observation by noting that he "continues to display severe delays in all areas of development" and suffers from "marked attention deficits". (Tr. 172-73).

Plaintiff's counsel then questioned Dr. Rothenberg. He first directed Dr. Rothenberg's attention to the fact that plaintiff's core language score was below the first tenth of a percentile on Ms. Singer's September 28, 2004 Speech and Language Evaluation Report. (Tr. 207-08). Although Dr. Rothenberg admitted that a score below the first tenth of a percentile is an extraordinary low score on any standardized test, he testified that while he did not see the plaintiff in 2004, the test results were unrepresentative of the plaintiff's performance at the hearing. (Tr. 208-09).

Plaintiff's counsel also asked Dr. Rothenberg what happens to children who meet the listing for attention deficit hypertensive disorder (ADHD) as a child when they reach age 18. (Tr. 209-10). Dr. Rothenberg said that the results vary as "[s]ome [children] do extremely well, some do well and some don't do so well as they go into young adulthood". (Tr. 210). He then testified that most of the patients sublimate, which appeared to be true of the plaintiff, since his learning disabilities would be minimized in the area of photography. (Tr. 211). When the ALJ interjected to ask whether the plaintiff is capable of doing any kind of work, including simple, repetitive tasks, Dr. Rothenberg stated that the plaintiff can perform work. (Id.).

37

Plaintiff's counsel next directed Dr. Rothenberg's attention to Susin Gladstone's May 12, 2004 progress report. (Tr. 211). The ALJ interrupted at that point to inquire as to Ms. Gladstone's qualifications, and suggested that the report was "a little antiquated" because the examination had been performed in May 2004. (Tr. 212-13). He also read aloud Ms. Gladstone's findings that Baldwin had significant receptive and expressive language disabilities related to the content of his speech and that 95% of his speech is intelligible to unfamiliar listeners. The ALJ opined that that was a "very high percentage." (Tr. 213-14).

Baldwin's attorney proceeded to direct attention to the section of Ms. Gladstone's report stating that Baldwin was unable to name more than five states and confused places and names. (Tr. 214). At this point the ALJ intervened again to state that he himself did not know the states that border Oklahoma and that he did not know that he could name the states that border New York. (Tr. 215). Dr. Rothenberg then replied, without any evident justification, that he thought that Baldwin "knows the number," apparently referring to Baldwin's ability to name the states bordering New York. (Id.). The ALJ then noted that his impression from listening to the plaintiff was that -- at least in terms of visual arts -- he was capable of doing more than Xeroxing papers in

38

an office. (Tr. 215-16).

Finally, the ALJ questioned whether the plaintiff could take care of himself, and Dr. Rothenberg replied that, according tot he record, the plaintiff could do so. (Tr. 218).

D. <u>The ALJ's Decision</u>

In a written decision on November 21, 2006, ALJ Nisnewitz declared Baldwin ineligible for SSI benefits based on his finding that Baldwin did not have a disability within the meaning of the Social Security Act. In his decision, the ALJ applied the five-step evaluation process required under 20 C.F.R. §§ 404.1520(a) and 416.920(a). (<u>See</u> Tr. 14-15). He first found that plaintiff had not engaged in substantial gainful activity since July 8, 2004, the alleged onset date of his disability. (Tr. 15). He next found that the plaintiff suffered from two severe impairments as defined in 20 CFR §§ 404.1520(c) and 416.920(c): an adjustment disorder with depression and anxiety and a history of speech developmental disorder, although neither met or medically equaled the criteria for <u>per</u> <u>se</u> disabling conditions as listed in Appendix 1, subpart P.

(Tr. 15-16).[25] As for the impact of these conditions, the ALJ found that the plaintiff had no physical limitations and had a mental residual functional capacity to perform at least simple, routine, repetitive unskilled work activity with normal supervision. (Tr. 16).

The ALJ clarified that plaintiff had no past relevant work, as defined in 20 C.F.R. §§ 404.1565 and 416.965, since he has been a student and just graduated from high school in June 2006. (Tr. 19).[26] The ALJ also determined that since the plaintiff was 18 years old on the alleged disability onset date, he was defined as a "younger individual age 18-44" under 20 C.F.R. §§ 404.1563, 416.963. (Id.). The ALJ also found that plaintiff had at least a high-school education and was able to communicate in English, as discussed in 20 C.F.R. §§ 404.1564 and 416.964. (Id.).

---

[25] If a claimant has a "listed" impairment, he will be considered disabled per se without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider whether the plaintiff still has the capacity to perform work. See, e.g., Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996)

[26] He further found that transferability of skills was not an issue in this case under 20 C.F.R. §§ 404.1568 and 416.968, as plaintiff did not have any past relevant work. (Id.).

As for alternative work, the ALJ found that although Baldwin's ability to perform work at all exertional levels has been compromised by non-exertional limitations, these limitations had little or no effect on the occupational base of unskilled work at all exertional levels. (Tr. 20). According to the ALJ, a finding of "not disabled" was appropriate under the framework of section 204.00 of the Medical-Vocational Guidelines.[27] (Id.). Therefore, considering plaintiff's age, education, work experience and residual functional capacity, the ALJ concluded that a significant number of jobs existed in the national and local economies that Baldwin could perform. (Tr. 19). This led to the ALJ's conclusion that the plaintiff was not under a "disability" as defined by the Act at any time through the date of the decision. (Tr. 20).

In support of these conclusions, ALJ Nisnewitz first summarized the plaintiff's hearing testimony about his educational history, hobbies, and non-exertional limitations. (Tr. 16). He also referred to the testimony of Baldwin's mother about his

───────────────

[27] The Medical-Vocational Guidelines, commonly referred to as "the Grids," take into account the claimant's residual functional capacity in conjunction with his age, education and work experience. Based on these factors, the Grids indicate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

limitations. (Id.). The ALJ also referred to his own observation at the hearing that he was able to hear and understand the plaintiff well. (Id.).

He then discussed the plaintiff's medical evidence, focusing on those records cited by Dr. Rothenberg during his hearing testimony. (See Tr. 17-19). The ALJ stated that Dr. Rothenberg's testimony "is the opinion which is given significant weight" because the plaintiff "is indicated to have improved significantly since much of the evidence of record was recorded." (Tr. 19).

During the course of reviewing the plaintiff's medical records, the ALJ noted instances in which Dr. Rothenberg disagreed with evidence in the record. For instance, he pointed out that Dr. Rothenberg was of the opinion that the plaintiff's extraordinarily low score on the September 28, 2004 CELF-4 test administered by Ms. Singer did not represent the plaintiff's abilities as demonstrated at the hearing. (Tr. 18). The ALJ also noted Dr. Rothenberg's disagreement with Dr. Algaze's suggestion of ruling out borderline mental retardation as a possible diagnosis for the plaintiff. (Id.)

The ALJ concluded his review of the medical evidence by stating that "the claimant's medically determinable impairments

42

could reasonably be expected to produce the alleged symptoms, but
.  .  .  the  claimant's  statements  concerning  the  intensity,
persistence and limiting effects of these symptoms are not entirely
credible". (Tr. 18-19). He found that although Baldwin "has some
mild to moderate limitations in activities of daily living, social
functioning and concentration, persistence or pace", nevertheless
"he is not precluded from sustaining at least simple, repetitive
unskilled  work  under  normal  supervision  and  has  no  physical
limitations". (Tr. 19). The ALJ stated that the plaintiff can
certainly perform unskilled work and may have the ambition to
perform skilled work (<u>id.</u>), a view he also attributed to Dr.
Rothenberg. (Tr. 18).

E. <u>The Appeals Council Decision</u>

Plaintiff sought review of the ALJ's decision by the Appeals
Council. (Tr. 9) The Appeals Council denied plaintiff's request for
review by notice dated June 1, 2007, making the ALJ'S decision the
final one on plaintiff's application for benefits. (Tr. 4-6).

IV. The Parties' Motions

Baldwin filed suit on August 2, 2007 challenging the Commissioner's decision as not supported by substantial evidence on the record and as being contrary to the law. The Commissioner responded by filing a motion for judgment on the pleadings, arguing that his determination that plaintiff was not disabled is supported by substantial evidence. (Def.'s Mem. 14-19). Specifically, the Commissioner relies on Dr. Rothenberg's testimony and the asserted failure of Baldwin's medical records to corroborate his alleged mental limitations. He argues that the record, including those portions supplied by the plaintiff's treating mental-health sources, supports the conclusion that plaintiff could perform simple, routine, repetitive unskilled work. In particular, the Commissioner states that Dr. Charles concluded that plaintiff had no significant limitations in understanding, remembering and carrying out simple instructions, performing activities within a schedule, making simple work-related decisions, responding appropriately to criticism from supervisors and getting along with co-workers and peers, and had moderate limitations only with respect to responding appropriately to changes in the work setting. (Def.'s Mem. 16).

44

The Commissioner further discusses plaintiff's mental functioning, noting that Baldwin had scored in the average to high-average range on an IQ test, graduated from high school, begun college and was capable of taking and printing digital photos. (Def.'s Mem. 15). The Commissioner also cites Ms. Gladstone's finding that plaintiff demonstrated normal articulation skills and that his speech was 95 percent intelligible (Def.'s Mem. 15), and Ms. Singer's assessment of the plaintiff's intelligibility as good. (Def.'s Mem. 16). The Commissioner also notes that the professionals who evaluated plaintiff opined that with proper vocational training, plaintiff could be gainfully employed, mentioning in particular the findings of Ms. Gladstone, Mr. Consolini and Dr. Shackelford. (Def.'s Mem. 16-17).

The Commissioner refers as well to the hearing testimony of plaintiff's mother that the plaintiff is capable of performing work which entails simple, repetitive tasks. (Def.'s Mem. 17). He also argues that plaintiff's testimony that he enjoyed taking pictures and printing them on his computer was another indication of his ability to perform at least simple, unskilled work. (Id.).

Plaintiff has also moved for judgment on the pleadings, seeking a remand of the matter for further administrative